COFFIN *v.* HAGGIN and others.

*(Circuit Court, D. California. March 13, 1882.)*

JURISDICTION—COLLUSIVE PARTIES.

Where parties conveyed land to a stranger, a citizen of another state, without his knowledge and without consideration, for the express purpose of creating a case of jurisdiction in the United States courts, and immediately, with the subsequent consent of the grantee, commenced a suit in the United States circuit court for the benefit of the grantors, expecting a reconveyance, although care was taken that there should be no promise made to reconvey, *held,* that the transaction was only colorable and collusive, for the improper purpose of creating a case of jurisdiction for the courts of the United States, within the provisions of the act of congress of 1875, and the suit must be dismissed for want of jurisdiction.

*Stetson & Houghton,* for complainant; *McAllister & Bergin,* of counsel.

*Louis T. Haggin* and *John Garber,* for defendants.

SAWYER, C. J. On April 15, 1880, one Bonestell conveyed to the complainant, Coffin, a citizen and resident of New York city and state, 1,920 acres of land, worth, according to his estimate, about $20,000—the expressed consideration being $10; but no consideration was in fact paid. The deed was *not recorded.* On the same day Mr. Stebbins also conveyed 1,280 acres in the same vicinity to the same party, costing and worth about $10 per acre, including some $6 per acre

expended for procuring water for irrigating—the expressed consideration in this deed being $10; but nothing being in fact paid. Neither Bonestell nor Stebbins knew Coffin, or ever saw him, or had any communication with him upon this or any other subject; and at the date of the conveyances, so far as Bonestell and Stebbins are aware, Coffin knew nothing either of the conveyances or the intention to convey to him. On April 25th, 10 days afterwards, and before sufficient time had elapsed to exchange communications by mail, this bill was filed to enjoin the diversion of the waters of Kern river from its channel, which ran through the lands conveyed. The bill alleges the ownership of the land by Coffin, and that Coffin is a citizen of New York, and the defendants citizens of California. The citizenship of the parties is the jurisdictional fact. The several defendants filed pleas to the jurisdiction, denying that Coffin is the *bona fide* owner of the land, but alleging that the land was conveyed to him by Bonestell and Stebbins, respectively, only colorably and collusively, for the sole purpose of enabling them to bring the suit and litigate it for their own benefit in the name of Coffin in the United States courts; that they are still the real parties in interest and substantial owners of the land.

The testimony upon the issues raised by these pleas, and the replications, is mainly that of Bonestell and Stebbins. Neither Coffin nor the attorney who managed the transaction was examined. Bonestell testifies—and the testimony of Stebbins is substantially the same—that he never saw or knew Coffin; that he made the conveyance by the advice of Redington for the purpose of beginning this suit; Stebbins' testimony is by advice of counsel; that no consideration was paid; that there was no agreement to reconvey, but he did not know but that he might get it back; that he expected he was to get it back some time, but not a word was said about getting it back; that it was said to him that an absolute deed was necessary without agreement to reconvey to give jurisdiction; that he was advised it was necessary to make an absolute transfer, and he made it; that the purpose was to bring this suit; that he hoped some time to get it back, but could not claim it; that he trusted entirely to Coffin's generosity, because it was considered one of those cases where it was necessary to make such a deed; that the attorney in the case, Mr. Stetson, told him that the deed was at the notary's, and he went there and executed it, and left it there to be called for; that he understood Mr. Coffin was in New York; that he never got the deed again, and don't know what became of it; that he intended it for Mr.

Coffin, because his name was in it, and there was no other person for it to go to. Mr. Stebbins testifies to a similar state of facts, and that, although there was no agreement to that effect, he hoped to get something—"I hope the suit on account of which I gave this title will result in establishing the title to the land. I gave the deed for that purpose, and if that purpose is accomplished I hope to get something for what I have deeded away." He stated that in making the conveyance without any previous consultation with Coffin, a stranger to him, he relied on the honor usually found among men in their transactions with their fellows.

Mr. Redington, who verifies the bill as the attorney in fact of Coffin, says that he knows Coffin; has heard about these deeds, but does not remember having ever seen them; has never had any conversation with Coffin upon the subject of the land; did not suggest to the grantors the making of the deeds; had nothing to do with making the deeds; had no conversation about the deeds, but received a telegram from Coffin requesting him to sign, as his attorney in fact, the papers in Stetson & Houghton's hands, referring as he supposed to the bill in equity in this case, which he accordingly did sign; that he has held a power of attorney from Coffin for several years. From other testimony it seems that Coffin is a partner of Mr. Redington in a New York firm of which Redington is a member. Mr. Stetson, solicitor of complainant, produced the deeds on request of defendants' solicitors. A clerk in the office of Mr. Stetson testified that by direction of Mr. Stetson he mailed the deeds to Mr. Coffin, at New York, on April 15th, in a registered letter, and in due course of mail, about the second or third of May, got a post-office receipt therefor. It does not appear what communication, if any, was made with the deeds; or what response, if any, to the communication was received from Mr. Coffin.

Whether the counsel, under whose advice these highly-important transactions were had, made any arrangement with Coffin on behalf of the parties in interest not communicated to them, and if so, what arrangement or what communication was had between them upon the subject of the conveyances and suit, does not appear. Whatever occurred—and in view of the great importance of the steps taken it is natural to suppose that something must have transpired—it is but fair to presume that what did take place between them would not strengthen the complainant's position, for it was important for him to make as strong a case on the pleas as possible. Had these facts been favorable to his view, as they were wholly under complain-

ant's control, it is scarcely probable that he would have omitted to put them in evidence. The defendants themselves have been compelled to go into the camp of their opponents for all their evidence to sustain their pleas. It is not to be presumed, therefore, that the evidence to support the pleas has even a gloss in defendant's favor that the facts will not fully justify.

Thus, to state the facts in the strongest light in favor of the complainant or complainants, as the case may be, whether nominal or real, I think it clearly appears from the evidence that the grantors, Bonestell and Stebbins, were desirous of bringing a suit in the United States courts to determine their rights to the waters of Kern river; and the United States courts not having jurisdiction over either the subject-matter or the parties, they set about devising some plan by which a case of jurisdiction could be made; that their counsel, Messrs. Stetson & Houghton, advised them that the object could be accomplished by making an absolute conveyance to a citizen of some other state, then bring and prosecute the suit in his name, but that in order not to defeat the jurisdiction it would be necessary to avoid making any agreement for a reconveyance; that it would be necessary to rely upon the honor of the grantee to reconvey the land; that Mr. Coffin's name was suggested by some one, it does not clearly appear by whom, and accepted; that the deeds were prepared by the counsel, sent to a notary for execution, and the parties notified to go and execute them, which they did, and left the deeds to be handed to Mr. Stetson, and that they subsequently came to his possession; that he caused them to be sent to Mr. Coffin, and immediately upon their receipt, this being the first intimation, so far as appears, to Coffin of the making of these deeds, he, Coffin, telegraphed to Redington to sign, as his attorney in fact, the bill in equity prepared by Stetson, which he accordingly did, and the bill in this case was thereupon filed ten days after the date of the execution of the deeds; that Bonestell thus deeded voluntarily, without consideration, to an entire stranger, whom he had never seen or known, and who had no interest whatever in the matter, property of the value of $20,000, for the very purpose of making a case of jurisdiction in this court, taking special care not to communicate with him on the subject, and especial care that no one should make any assurance or intimation of any reconveyance; and Stebbins, in like manner and with like precaution, for the same express purpose, conveyed property of the value of more than $12,-000; that the sole purposes of the said grantors in making the conveyance was to prosecute their contemplated suit in the name of Cof-

fin in the United States courts, but for their own benefit, relying upon Coffin's honor to reconvey at the termination of the litigation, or before, and expecting he would so reconvey; that Coffin, upon being informed of the execution of the deeds, co-operated in this plan by immediately authorizing by telegraph the proposed suit to be commenced in his name. What further he may do, of course remains for the future to disclose. He has got standing in his name, however, a large amount of property which was conveyed to him by entire strangers, without consideration, and even without his knowledge, for the sole purpose of giving to the United States courts jurisdiction of a suit to be prosecuted in his name for their own benefit, and relying upon his honor as a man to reconvey to them on or before the accomplishment of their object. Immediately upon receiving the information as to what has taken place, he assents to the bringing of the suit, the papers in which were, doubtless, and must almost necessarily have been, already prepared, and then accepts the situation and co-operates with his grantors in carrying out their purposes. He does not even await the slow process of communication by mail, but uses the telegraph to express his assent. He does not act of his own motion, but moves upon the suggestion of others to carry out their own purposes. He cannot repudiate the right or claim of his grantors to a reconveyance upon the accomplishment of their purpose, notwithstanding the fact that care was designedly and studiously taken not to commit him by express promise, without an act of *perfidy*. To refuse a reconveyance under the circumstances would be a breach of confidence, a breach of faith and trust between man and man, of which no honest or honorable man would be guilty.

There can be no possible doubt that this is in fact, whatever it may be in form and appearance, the suit of Bonestell and Stebbins, for their own use and benefit, and that the conveyance and prosecution of the suit in another's name are only colorable and collusive. It is no less so because the agreement and co-operation are tacit and not express. The fact that the conveyances were made by the grantors for their own purposes of bringing and prosecuting the suit, without even the knowledge of the grantee, and that the grantee immediately, without delay or hesitation, carried out that special purpose upon receiving information of their act and design, shows an assent to their act, a co-operation in their purpose, and further shows that parties have been "collusively made, for the purpose of creating a case cognizable * * * in the said circuit court," and "that such suit does not really and substantially involve a dispute or contro-

versy properly within the jurisdiction of said circuit court," within the meaning of the provisions of section 5 of the act of 1875. The case of *De Laveaga* v. *Williams,* 5 Sawy. 574, is relied on by complainant to sustain the jurisdiction in this case, and it is, I think, very apparent that the whole arrangement in this case was made and all the steps taken with especial reference to the rulings in that case, with a preconceived purpose to bring it within that decision. It is true that that suit was brought since the passage of the act of 1875; but it was considered and decided with reference to the decisions of the supreme court made upon prior acts of congress. I took part in the decision, and although I thought the question not free from doubt, yet upon the whole I came to the conclusion that it was in accordance with the rulings of the supreme court as they then stood under the prior statutes. It was not suggested by counsel on the hearing, however, that the provisions of section 5 of the act of 1875, in any degree affected the question, nor did it occur to my mind, nor was the effect of that act considered by the court in deciding the case.

The decision of the supreme court at the present term, in *Williams* v. *Town of Nottawa,* shows that that act has an important bearing upon this question, which must now be considered. In that case the court, by the chief justice, says:

"But whatever may have been the practice in this particular under the act of 1789, there can be no doubt what it should be under the act of 1875. In extending a long way the jurisdiction of the courts of the United States, congress was specially careful to *guard against the consequences of collusive transfers to make parties,* and made it the duty of the court, on its own motion, without waiting for the parties, *to stop all further proceedings and dismiss the suit the moment anything of the kind appeared.* This was for the protection of the court as well as the parties against fraud upon its jurisdiction; for, as was very properly said by Mr. Justice Miller, speaking for the court, in *Barney* v. *Baltimore, supra,* 'such transfers for such purposes are frauds upon the court, and nothing more.' * * * Inasmuch, therefore, as it was the duty of the circuit court, on its own motion, as soon as the evidence was in, *and the collusive character of the case shown,* to have stopped all further proceedings and dismissed the suit, the judgment is reversed and the cause remanded, with instructions to dismiss the suit at the cost of the plaintiff in error, *because it did not really and substantially involve a dispute or controversy within the jurisdiction of the court.* * * * In this connection we deem it proper to say that this provision of the act of 1875 is a salutary one, and that *it is the duty of the circuit courts to exercise their power under it in proper cases.*"

After a full consideration of the facts I am constrained to think that this is a case which the court, under the act of 1875, is required to dismiss on the ground that it is colorably and collusively brought in the name and with the acquiescence of a party who has really no substantial interest in the matter.

I therefore find the plea to be true, and that defendants are entitled to have the bill dismissed for want of jurisdiction, and it is so ordered.